SUMMIT L. HECHT & others *vs.* BOSTON WHARF COMPANY.
JEREMIAH WILLIAMS & others *vs.* SAME.
JACOB F. BROWN & others *vs.* SAME.

Suffolk.   January 13, 14, 1915. — February 27, 1915.

Present: RUGG, C. J., LORING, BRALEY, DE COURCY, & CROSBY, JJ.

*Warehouseman.   Act of God.   Tide.   Bailment.   Proximate Cause.*

An act of God, such as will relieve a warehouseman or bailee from liability for damage to or the destruction of goods entrusted to his charge for hire, may be defined as the action of an irresistible physical force not attributable in any degree to the conduct of man and not in reason preventable by human foresight, strength or care.   By RUGG, C. J.

It cannot be ruled as matter of law that damage to goods stored in sheds of a warehouseman fronting on tidewater, which was caused by an extraordinarily high tide, was the result of an act of God, if the exercise of the ordinary prudence, foresight, care and skill reasonably to have been expected from a warehouseman in the performance of his duty would have prevented the damage.

In an action by the owner of certain wool for its damage by salt water in 1909 when stored in the warehouse of the defendant on the water front of Boston at the time of the highest tide that had risen in Boston Harbor for nearly sixty years, where it appeared that the tide that caused the damage rose to the height of fifteen and six tenths feet above Boston base, which was about two thirds of a foot below mean low tide, there was testimony of experts that before the tide that caused the damage the minimum height for the storage of wool near tide water was fifteen and six tenths feet above Boston base, and there was evidence that in a great storm in 1898 two of the three sheds of the defendant in which the plaintiff's wool was damaged were flooded by a tide that rose to a height of fourteen and ninety-four one hundredths feet, that thereafter the floors of these sheds were raised but that they afterwards had settled so that when the plaintiff's wool was injured there were places in each of the sheds as low as fourteen and ten one hundredths feet, fourteen and twenty-four one hundredths feet and fourteen and forty one hundredths feet above Boston base, that these levels were lower than the recorded heights of a number of previous tides, that records of the tide heights in Boston Harbor were available in the city engineer's office, had been published in that officer's reports for a number of years and had been referred to in other public records.   *Held,* that there was evidence for the jury of negligence on the part of the defendant in the performance of its contract as warehouseman or bailee of the wool.

A wool dealer by storing wool for a number of years in the sheds of a warehouseman on the water front of Boston, without objecting to the level of the floors of the sheds, does not assume the risk of damage to the wool from an unusually high tide, damage from which could be avoided by raising the floor level of the sheds or making them to some degree waterproof, such dealer having the right

to assume that the warehouseman will perform his duty by using due care for the safety and protection of the goods stored.

A dealer, who stored with a warehouseman certain goods which were damaged by reason of negligence on the part of the warehouseman, in an action at common law against the warehouseman for such damage to the goods cannot recover for damage to a part of the goods which, when they were fully identified by definite marks, were sold by him to a customer before the damage occurred, the bailor having no relation of trust toward the buyer.

THREE ACTIONS OF CONTRACT OR TORT by different plaintiffs against the Boston Wharf Company, a corporation carrying on the business of a warehouseman, for damage to wool belonging to the several plaintiffs and stored in the sheds of the defendant adjoining the Fort Point Channel in the part of Boston called South Boston by reason of sea water entering the sheds during a high tide on December 26, 1909. Writs dated December 21, 1910.

The cases were referred to Charles E. Shattuck, Esquire, as auditor, who made a finding in favor of the plaintiffs. Later the cases were tried together before *Fessenden*, J. The jury took a view of the premises. The plaintiffs introduced in evidence the auditor's report and the exhibits referred to therein and also the oral testimony of five witnesses. The defendant called fourteen witnesses who testified in its behalf. The evidence is described in the opinion.

At the close of the evidence the judge required the plaintiffs to elect whether they would go to the jury upon the count in contract or upon the count in tort in each declaration, and they all elected to rely upon the count in contract. This count in each of the declarations alleged that the defendant was engaged in the business of a public warehouseman for hire at Boston, and, in consideration of the plaintiffs entrusting it with the care and custody of various large and valuable quantities of wool and in consideration of the plaintiffs undertaking to pay compensation for such care and custody and all other proper charges thereon, the defendant undertook and faithfully promised the plaintiffs to take due and proper care and custody thereof in all ways while it was in the possession of the defendant; that the plaintiffs performed all things by them to be performed, and all conditions precedent to performance on the part of the defendant; yet that the defendant, while it so had the care and custody of the

wool, took so little and such bad and improper care thereof that on December 26, 1909, large portions of the wool were wholly and completely destroyed and other large portions of it were damaged, and the remainder was rendered much less salable and much less fit for commercial purposes.

At the close of the evidence the defendant asked the judge to make the following rulings (besides others which were given by the judge as instructions to the jury):

"1. The jury must return a verdict for the defendant.

"2. The facts found in the auditor's report do not warrant a verdict for the plaintiffs.

"3. Upon the undisputed facts the high tide of December 26, 1909, amounted in law to an 'act of God.'"

"5. The evidence does not warrant a finding that the damage to the wool was caused solely by the negligence of the defendant."

"7. The evidence does not warrant a finding that the defendant failed to exercise ordinary care with reference to the wool."

"9. The defendant was not required to provide against an unprecedented emergency.

"10. The care of the defendant is to be determined upon the basis of its knowledge and experience prior to this event, and what the situation then seemed to call for."

"13. The plaintiffs cannot recover unless they have themselves exercised due care in the premises.

"14. If the plaintiffs knew where their wool was being kept and acquiesced for a long time in its being kept there they cannot now recover upon the ground that it was negligence to keep it in that place.

"15. If the plaintiffs knew for a long time where their wool was being kept and made no objection to the place, that is evidence upon the question whether the defendant was negligent in keeping it there.

"16. One who knows for years where his property is being stored, makes no objections to its being stored there, and keeps sending there property of the same kind which he knows is being put in the same place, cannot recover upon the ground that the place is an unsuitable one.

"17. Damages are not recoverable from a warehouseman, a bailee for hire, because of injury to goods stored through the

unfitness of the warehouse as a place of storage, where the bailor has equal opportunities with the bailee of knowing whether his goods are liable to injury by storage in an unsuitable place.

"18. When the bailor knows the place where and the manner in which the goods deposited are to be kept, he must be presumed to assent in advance that his goods shall be thus treated, and if, under such circumstances, they are damaged or lost, it is by reason of his own folly or fault, and he cannot recover."

"24. If an 'act of God' was the direct and proximate cause of the damage the defendant is not liable.

"25. If an 'act of God' was a direct and proximate cause of the damage the defendant is not liable."

"27. The evidence does not warrant a finding of more than nominal damages.

"28. If the plaintiffs are entitled to recover, the measure of damages is the difference between the fair market value of the wool as it lay in the sheds just before the tide reached it and its fair market value as it lay in the sheds just after the tide reached it.

"29. In determining its value just before the tide reached it, its situation with reference to the rising flood, the peril to which it was then exposed, and the possibility of saving it on that Sunday, are all to be taken into account.

"30. In determining the value of the plaintiffs' wool immediately before it was damaged, the jury must take into account the fact that it was then lying within reach of a tide, rising steadily and inevitably to a height beyond any which the plaintiff should reasonably anticipate, such as to constitute an 'act of God,' which tide would, within a few moments, inevitably submerge and injure the wool and that there was no possibility of removing it."

The judge submitted the cases to the jury and also submitted to them the following question:

"Ought the defendant in the exercise of reasonable care to have stored the wool above the height to which the water rose December 26, 1909?"

To the specific question above quoted the jury answered "Yes." They returned a verdict for the plaintiffs in each of the cases, in the case of Hecht and others in the sum of $4,330.04, in the case

of Williams and others in the sum of $324.25, and in the case of Brown and others in the sum of $23,908.20. The defendant alleged exceptions in each of the cases.

In the case of Hecht and others it appeared that the number of packages of wool of those plaintiffs stored with the defendant and damaged by sea water was three hundred and eighty-nine, and that of these eighty-eight bags had been sold to certain manufacturers at the time the damage was sustained but had not been delivered and remained in the defendant's sheds; and in the case of Brown and others it appeared that the whole number of packages of wool stored with the defendant and consequently injured was fifteen hundred and eighty-one and that of these four hundred and thirty-four bags had been sold to certain manufacturers before the damage was sustained but had not been delivered and remained in the defendant's sheds. In these two cases the plaintiffs contended that they were entitled to recover, not only for the damage to the wool still owned by them, but also for the damage to the part of the wool that they had sold, holding the money so recovered in trust for the purchasers of the wool. The judge refused to submit to the jury the question of the defendant's liability to the plaintiffs for the damage done to the bags of wool which had been sold, but submitted to the jury the question of the defendant's liability for the damage done to the unsold portion of the goods. He instructed the jury that the plaintiffs had not suffered any damage in regard to the wool that they had sold. The plaintiffs in these two cases alleged exceptions.

*T. Hunt*, (*F. W. Bacon & O. T. Russell* with him,) for the defendant.

*D. A. Ellis*, (*S. M. Whalen* with him,) for the plaintiffs.

Rugg, C. J. These are actions of contract wherein the plaintiffs seek to recover damages caused by the wetting with salt water of wool severally stored by them with the defendant, a warehouseman, on the water front in Boston. The direct means of the injury was the tide of December 26, 1909, which rose to such a height as to come into the sheds of the defendant, where the wool of the plaintiffs was stored, to a depth of several inches.

No question now is made as to the fact of damage. The main

contention of the defendant is that this tide was of such an extraordinary character as to amount to an "act of God" within the meaning of that phrase in the law. In its juridical sense an act of God may be defined as the action of an irresistible physical force not attributable in any degree to the conduct of man and not in reason preventable by human foresight, strength or care. Perhaps no definition could be framed in terms comprehensive enough to include every state of facts, but this is sufficient for the present cases. See *The Majestic*, 166 U. S. 375, 386, and 1 Corpus Juris, 1172 *et seq.*, for other definitions. Tides are manifestations of the forces of nature quite beyond the power of man to control. Human agency does not in any degree enter into their creation, their flood or their reflux. In this sense tides always are the act of God, for which man is not responsible. When damages are sought at law in such a connection, the test of liability of a defendant upon whom a duty is cast, is whether the injury caused by the tide is an inevitable accident due wholly to the violence of the natural phenomenon, and not referable in any degree to the participation of man by unreasonable failure to anticipate danger, to put forth appropriate preventive measures or protective instrumentalities, or to employ rational means to ward off the probable consequences of the event. The human element enters into damages resulting from a cause like a high tide only in omission seasonably to be vigilant to avert the disaster or to mitigate its consequences by the use of such expedients and safeguards as reasonably might be expected under all the circumstances. Through failure in this respect man may concur as a contributing proximate cause with the forces of nature. But the use of the means to which prudent and careful persons in the same line of business ordinarily have recourse is all that can be required. If, having done this, a defendant is overpowered by storm or tide or flood, he is free from liability. The highest ingenuity of the intellect is not demanded. Nothing more can be exacted than such wisdom and prevision as the ordinary man would have manifested to avoid a hazard or forestall a danger of which some warning actually had been given by previous experience or fairly would be disclosed by the application of sound judgment to an observation of general climatic conditions, prevailing customs and all available sources of in-

formation naturally to be resorted to by a reasonable man. *Nugent* v. *Smith,* 1 C. P. D. 423, 438. *Nichols* v. *Marsland,* 2 Ex. D. 1. *Gray* v. *Harris,* 107 Mass. 492. *Cork* v. *Blossom,* 162 Mass. 330, 332.

The precise point to be determined in the cases at bar is whether this particular tide was of such an extraordinary height that the resulting mischief would not have been guarded against by the prudence, foresight, care and skill reasonably to have been expected of the defendant in the performance of its duty as warehouseman.

The determination must rest upon a consideration of all the facts which the defendant within reason might have been required to know in the careful conduct of its business before this particular tide. It cannot be held to the exercise of a degree of sagacity which a reasonable warehouseman using due caution for the preservation of goods at the present time deposited with him, in the light of the experience gained from that tide, now would put forth but would not have thought of practicing before that event. The legal obligation of the defendant was to use the ordinary care of the man of common prudence in keeping the kind of goods deposited with it, in view of the facts accessible to and likely to be considered and acted upon by a reasonable person before the event complained of. *Willett* v. *Rich,* 142 Mass. 356. *Maynard* v. *Buck,* 100 Mass. 40, 47. *Murray* v. *International Steamship Co.* 170 Mass. 166. This is the same rule put in equivalent words as a requirement to exercise the care of "a reasonably careful owner of similar goods" in the management of his own concerns, and an exoneration from liability for "loss or injury to the goods which could not have been avoided by the exercise of such care." The warehouse receipt act (St. 1907, c. 582, § 22). *Sullivan* v. *Scripture,* 3 Allen, 564, 565. *Maynard* v. *Buck,* 100 Mass. 40, 47. Stated broadly, the principles of law respecting liability for damages arising from high tides are no different from those which govern liability flowing from different natural phenomena and the manifold other conditions constantly presented in every-day affairs. The test is whether the due care of the reasonable man under all the circumstances has been exercised.

The facts in the cases at bar must be examined to determine

whether as matter of law it could have been found that the defendant failed in the performance of this duty.

There was an auditor's finding in favor of the plaintiffs. Unless the facts stated in the report were not sufficient to support the conclusion, or were so inconsistent in themselves as to neutralize each other, or were overcome by other evidence, that was evidence sufficient to warrant a verdict by the jury in favor of the plaintiffs. *Fair* v. *Manhattan Ins. Co.* 112 Mass. 320, 331. *Newell* v. *Chesley*, 122 Mass. 522. *Fisher* v. *Doe*, 204 Mass. 34.

The elemental facts were not very much in dispute and might have been found to be as follows: This tide was described by witnesses as extraordinarily high. The height reached by it was fifteen and six tenths feet above the arbitrary level in common use in the neighborhood, known as Boston base, which was about sixty-four one hundredths of a foot below mean low tide. This height had been exceeded slightly by the tide of 1851, which destroyed Minot's Ledge Light House. There were also tides higher than fifteen feet in 1830 and in 1847, and on seventeen other occasions from 1850 to 1905 the tide had risen to fourteen feet or more. The tide in question was three and eighty-six one hundredths feet above its predicted height. This was attributed to an accompanying severe storm, low barometer and a northeast wind of great velocity. None of these three factors was excessive and not infrequently had been equalled. Within the twelve previous years the tide on four different occasions had risen three feet or more above its predicted height, and one tide had exceeded its prediction by four and one tenth feet, surpassing in this respect the tide in question by almost two inches. An increment of this magnitude on the normal or predicted height of tides appreciably lower than that of the one here in question would have brought the water to its level.

A severe storm, known as the Portland storm because a steamer of that name then was lost, occurred in 1898. Its accompanying tide arose to a height of fourteen and ninety-four one hundredths feet, and water then entered two of the three sheds of the defendant which were wet by the 1909 tide. The floors of those sheds were raised thereafter, but subsequently settled so that, although some parts were higher, there were places in each of the sheds as low as fourteen and ten one hundredths feet, fourteen and twenty-

four one hundredths feet and fourteen and forty one hundredths feet above Boston base, on December 26, 1909. These levels were lower than the recorded heights of several other tides.

The records of tide heights about Boston Harbor, including those above mentioned, were available at the city engineer's office and had been published in his reports for a number of years, and reference had been made to them in other public records. There were several civil engineers in Boston who had made special study of the subject of tides and were prepared to and did advise numerous persons as to the elevation of structures in order to be secure from damage by tides.

Considerable testimony was introduced from experts on tides to the effect that the minimum height for storage of wool in the light of experience and knowledge available before the date in question, was fifteen and six tenths feet above Boston base. The practice of others engaged in the same business as to the elevation of storerooms was evidence competent to be considered as bearing upon the negligence of the defendant. *Cass* v. *Boston & Lowell Railroad,* 14 Allen, 448. *Pitcher* v. *Old Colony Street Railway,* 196 Mass. 69. *McCrea* v. *Beverly Gas & Electric Co.* 216 Mass. 495, 498. *Canadian Northern Railway* v. *Senske,* 120 C. C. A. 65, 72. Some evidence of this sort showed elevations higher than that maintained by the defendant in its sheds where the plaintiffs' wool was stored.

It is apparent from what has been said that the plaintiffs' cases did not rest upon the bald fact that the tide which caused the damage was the highest for nearly sixty years. There were many other circumstances bearing upon the issue. The subject of high tides was one to which the attention both of experts and of the public had been directed to a greater or less extent. The partial flooding of the defendant's own premises in 1898 had called its notice pointedly to the dangers incident to high tides. Reasonable caution might have been found to require not only bare avoidance of known precedents, but a slight factor of safety in the presence of such powerful forces as tides. The defendant was conducting its business not in a new and untried country, where there must be something of the unknown even in the recent past, but in one of the oldest and most highly commercialized cities of the continent, where records appear to have been kept

for a long period with considerable accuracy and studied with care, so that the teachings of experience might have been found to have been available to the ordinarily prudent business man even though himself lacking in exact knowledge. The state of society, the customs of others and the limits of reasonable expense sometimes may be decisive elements in exonerating a defendant from liability for damages resulting from unusual though not unprecedented storm or freshet, cold or flood. On these grounds perhaps *Cowles* v. *Pointer,* 26 Miss. 253, and *Pearce* v. *The Thomas Newton,* 41 Fed. Rep. 106, may be distinguished. The defendant's business was not of a nature to render impracticable the avoidance of damages from the tides. All that appears to have been required was the elevation of the floor level of its sheds or some degree of waterproofing. The improbability of the occurrence of the event is not the sole consideration, but the feasibility of preventing injurious results flowing from it often is a potent factor in determining whether there is liability. *Cormack* v. *New York, New Haven, & Hartford Railroad,* 196 N. Y. 442, *Jones* v. *Minneapolis & St. Louis Railroad,* 91 Minn. 229, and like cases, are instances where human diligence and sagacity were powerless in reason to avert the consequences of the operation of snow or storm or cold. But they are distinguishable from the cases at bar.

There was much evidence coming both from the testimony of witnesses and from the fair inferences from other facts which tended to exonerate the defendant from negligence. But we are of opinion on the whole that its weight was for the jury and that it could not have been ruled as matter of law that there was nothing upon which to rest a finding of negligence on the part of the defendant. The cases are very close on their facts. Verdicts in favor of the defendant certainly would have been warranted. But the jury hardly could have been directed that there was no evidence of negligence worthy of consideration. This conclusion is supported by *Nitro-Phosphate & Odam's Chemical Manure Co.* v. *London & St. Katharine Docks Co.* 9 Ch. D. 503, *Carney* v. *Caraquet Railway,* 29 New Brun. 425, and *Burt* v. *Victoria Graving Dock Co. Ltd.* 47 L. T. (N. S.) 378. *Gulf Red Cedar Co.* v. *Walker,* 132 Ala. 553. See also *Gleeson* v. *Virginia Midland Railroad,* 140 U. S. 435; *Howe* v. *Ashland Lumber Co.* 110 Maine, 14;

*Kansas City* v. *King,* 65 Kans. 64; *Ohio & Mississippi Railway* v. *Ramey,* 139 Ill. 9; *Chicago, Peoria & St. Louis Railway* v. *Reuter,* 223 Ill. 387; *State* v. *Ousatonic Water Co.* 51 Conn. 137; *Willson* v. *Boise City,* 20 Idaho, 133; *New Brunswick Steamboat Co.* v. *Tiers,* 4 Zabr. 697, 714; *Gulf, Colorado & Santa Fe Railway* v. *Pomeroy,* 67 Texas, 498, 501; *Atkinson* v. *Chesapeake & Ohio Railway,* 74 W. Va. 633; *Kuhnis* v. *Lewis River Boom & Logging Co.* 51 Wash. 196.

Reliance is placed by the defendant on *The C. H. Northam,* 181 Fed. Rep. 986. That, however, was a finding as matter of fact by a district judge upon the evidence before him, and does not rest upon any principle of law at variance with the conclusion here reached.

The defendant presented several requests for instructions in different forms, to the effect that if the plaintiffs knew where their wool was being stored and continued for a series of years without objection to deposit with the defendant, they consented to the particular place of storage and assumed the risks arising therefrom. These requests rightly were refused. The acceptance of the wool on storage for hire involved the obligation on the part of the defendant to use due care for its safety and protection. That was implied from the relation it assumed as warehouseman. Mere knowledge and acquiescence by the owner as to the place of storage are not enough to modify that contractual obligation. Essential elements as to the care required by the contract of storage in the cases at bar lie outside the mere place of storage. Nothing as to waiver of that obligation respecting protection of the goods from the danger of injury from tides was tacitly inferable from such knowledge and acquiescence as was attributable on the evidence to the plaintiffs. *Conway Bank* v. *American Express Co.* 8 Allen, 512. *Mooers* v. *Larry,* 15 Gray, 451. *Brabant & Co.* v. *King,* [1895] A. C. 632, 641. *Searle* v. *Laverick,* L. R. 9 Q. B. 122. The decisions relied on by the defendant upon this point are distinguishable. *Knowles* v. *Atlantic & St. Lawrence Railroad,* 38 Maine, 55, arose out of gratuitous bailment. *Brown* v. *Hitchcock,* 28 Vt. 452, 458, and *Parker* v. *Union Ice & Salt Co.* 59 Kans. 626, rest upon peculiar facts which showed such intimate familiarity with all the attendant conditions or personal directions touching the storage as to amount to a waiver of the

usual terms of the contract of bailment.  No such circumstances are to be found in the cases at bar.

The plaintiffs Hecht and others and Brown and others sold certain bags of wool, stored with the defendant, before December 26, 1909, and received full payment therefor.  The ruling of the Superior Court that these plaintiffs could not recover damages for injury to the wool thus sold was right.  The liability of the defendant is to be determined according to the principles of the common law, for the bill of exceptions contains no reference to the warehouse receipts act, nor to the kind of receipts, if any, issued by the defendant.  It simply is stated that the defendant was a public warehouseman.  It may be assumed under all the circumstances that it assented to the sale, if that affects favorably its liability.  The title to this wool had passed from the plaintiffs to their customers.  Each bag was identified by definite marks.  The wool, therefore, was "specific goods, in a deliverable state," and under the sales act (St. 1908, c. 237, § 19, rule 1) the title vested in the purchaser upon the making of the contract of sale.  It further is provided by § 22 of the sales act that such goods are at the buyer's risk whether delivery has been made or not.  Thus the difficulties as to change of possession and assent suggested in *Hallgarten* v. *Oldham*, 135 Mass. 1, 9, and *Selliger* v. *Kentucky*, 213 U. S. 200, 205, are eliminated.  The plaintiffs do not contend that they had suffered loss on account of these bags, but they ask to recover damages and to hold the proceeds as trustees for the true owners.  See *Boyden* v. *Hill*, 198 Mass. 477, 487.  The owner of goods, or one having some general or special interest in them, commonly is the one to bring action for damage to them.  See *Commercial National Bank* v. *Bemis*, 177 Mass. 95.  Plainly the plaintiffs are not the owners and they do not contend that they are.  They seek to maintain these actions only on the authority of *Blanchard* v. *Page*, 8 Gray, 281, and *Finn* v. *Western Railroad*, 112 Mass. 524.  These have been recognized generally as leading decisions and would be followed implicitly in similar cases.  But the principles there declared are not applicable to the facts in the cases at bar.  In the former of these two cases, the shipper, the agent for an undisclosed principal who was not the consignee, was permitted to recover of a ship owner for breach of the contract of carriage.  In the latter

case the consignor, who delivered goods to a common carrier, was permitted to recover damages for breach of the contract of carriage in the absence of evidence to the effect that the consignee was the owner and did not acquiesce in recovery of the full value of the goods by the consignor. But the relation between a depositor of goods and a warehouseman, the owner and agistor, and generally of a bailor and bailee, is not the same as that of shipper and common carrier. The obligation of the carrier is to perform its contract for transportation, generally set forth in a bill of lading, to which the consignor is a principal party. The duty of the bailee is commonly to deliver to the owner when he is known, in instances where there has been transfer of title during bailment, and not to the depositor. The obligations respectively resting upon the parties (apart from statute) are not in kind like those arising out of the issuance of a bill of lading by a common carrier. *Krulder* v. *Ellison*, 47 N. Y. 36. *Merchants' Despatch Co.* v. *Smith*, 76 Ill. 542. *Dawes* v. *Peck*, 8 T. R. 330. The relation between a bailor, who has sold the goods bailed, and the purchaser, is not naturally one of trust and confidence. They are at arms length as to each other. Therefore the bailor shows no right to recover the value of the goods bailed if he has parted with all title.

Let the entry in each case be

> *Defendant's exceptions overruled.*
> *Plaintiffs' exceptions overruled.*