TROUT BROOK COMPANY, Appellant, vs. WILLOW RIVER POWER COMPANY, Respondent.
NORD, Appellant, vs. SAME, Respondent.

*April 29—June 2, 1936.*

For the appellants there was a brief by *Wilcox, Wilcox & Sullivan* of Eau Claire, and oral argument by *Francis J. Wilcox*.

*Spencer Haven* of Hudson, for the respondent.

ROSENBERRY, C. J.   The Willow river is a stream twenty-five miles long, rising in the northeasterly corner of St. Croix

county, running in an irregular generally southwesterly direction to New Richmond, and from thence southwesterly to Hudson, where it discharges into the St. Croix river, or Lake St. Croix, as it is sometimes called, at the city of Hudson. At the time in question the New Richmond Roller Mills in the city of New Richmond owned and operated a small dam with a drainage area of one hundred fifty-eight square miles. It is the first dam located on the river and is eight or nine miles upstream from the first dam owned by the defendant, which is known in the evidence as the Mounds dam. The Mounds dam is a large concrete overflow dam that is constructed without gates, built in 1925, some three hundred feet in length, located in a gorge of the river, having a drainage area of two hundred twenty-five square miles. Downstream from the Mounds dam is the Willow Falls dam, which is located about one and one-half miles from the Mounds dam, built of concrete, and erected in 1914. It is a very high dam (one hundred feet head) located in an extremely narrow gorge with rock walls approximately one hundred thirty feet in length, having four gates which furnish an area for the passage of water of six hundred sixty-six square feet. It has a drainage area of two hundred thirty-six square miles.

Downstream from the Willow Falls dam is the Little Falls dam, distant one and three-fourths miles. This dam as originally built of timber in 1894, was rebuilt of concrete in 1916. After it was reconstructed, it had a dirt fill at the southerly portion of the dam of one hundred fifty feet in length, which was unsurfaced and unreinforced except for concrete wing walls at the point of union with the concrete portion of the dam. The dirt fill was constructed and maintained at a height level with the top of the concrete portion of the dam. The total length of this dam including the dirt fill was three hundred fifteen feet. It ran generally in a north and south direction across the stream bed, the bank to the north being

high and the bank to the south being low and flat, for a distance of approximately one thousand feet, at which point it rises gradually to higher ground. The concrete portion of the dam had a seventy-two-foot spillway on the north end and three gates 9x12 feet in the central portion. The spillway was seventy-two feet long and passed at full capacity three feet of water over its top. The dam was shown to have a discharge capacity of four thousand eight hundred sixty feet at the height of two and one-half feet over the spillway. This includes gates and spillway.

The property of the plaintiff was located approximately one and one-half miles downstream from the Little Falls dam. It consists of a series of trout ponds, the water supply being drawn from the river, the flow being controlled by a gate. These ponds were protected from the river by a dike or dirt fill. The height of the dike above the normal flow of the river does not appear. The manager of the plaintiff company testified that he had been in charge of the property since about 1891; that the ponds had not been flooded except upon one prior occasion when a part of the Little Falls dam went out. Between three and four miles downstream from the Little Falls dam, near the mouth of the Willow river is another dam owned and operated by the defendant.

*On the night of April 2 to 3, 1934,* there was a heavy rain two or three inches on two to three inches of damp, heavy snow, and the ground was frozen.

*April 3, 1934.* At the trout ponds the water was high. The plaintiff was engaged in protecting its property, and at about 3 in the morning asked the defendant company to lower the water at the trout ponds by opening the gates of the dam at Hudson.

Gunderson, the operator of the New Richmond mills, testified that in the dam at that point there were five seven-foot gates and two nine-foot gates. He

was at the dam at 3 o'clock in the morning. He expected trouble because of the flood which was the largest in his experience. He opened all the gates at 3 a. m. The water began to gain on the gates, sand bags were used, and about 6 in the morning he telephoned the defendant company. About 10 the water began to rise faster than it could be discharged. The dam broke about 3 p. m. The water continued to rise after the dam broke until 6 a. m., when it commenced to recede gradually.

The Mounds dam having no discharge except the gate leading to the wheels, the flow of the stream went over the spillway. At *6:30 a. m.,* at that point, the water was *nine inches* deep over the spillway. At *8:30 a. m.* it was *eight inches;* at *5:30 p. m.,* thirty-six inches; at *9 p. m. forty-eight inches.* Thereafter it began to recede, and at *2 p. m.* it was *thirty-six inches* over the spillway. The highest record depth prior to April 3d was twenty-seven inches. The Mounds dam at the peak of the flood passed between six thousand five hundred and seven thousand five hundred cubic feet of water per second.

The peak of the flood reached the Willow Falls dam at *9:30 p. m.* The water was then eighteen inches over the top of the dam and fifty-four inches over the top of the gates. Between 12 and 1 p. m. one gate was opened and another partly opened at the Willow Falls dam. At 3 p. m. all gates were opened at the Willow Falls dam. At 6 p. m. the Willow Falls dam was passing all flood water. Early in the morning of April 3d, the defendant stationed two men to patrol the Willow Falls and Little Falls dams. Between 1 and 1:30 p. m. they opened one gate at the Little Falls dam and shortly thereafter a second gate.

By 4 p. m. all the gates of the Little Falls dam were opened. Between 4 and 6 p. m. with all gates opened the water receded at the Little Falls dam about two inches. The water in the pond at 6 p. m. commenced to rise, and continued to rise until the peak of the flood reached the Little Falls dam about 10 p. m. The Little Falls dam could not pass the water at the peak, it poured over the earth embankment which gave away about 11 p. m. The peak of the flood reached New Richmond about 6 p. m., and the Little Falls dam between 10 and 11 p. m., although the gates at New Richmond were opened at 6 a. m. and the water receded until 10, the water gained on the gates thereafter, and in spite of the twenty-foot break in the dike of the New Richmond millpond at 3 p. m., the peak of the flood did not reach New Richmond until 6 p. m.

This statement is intended to represent the general situation. We have not attempted to delineate it with meticulous accuracy. In the case of substantial dispute, the state of the facts as found by the jury has been assumed to be true.

Plaintiff contends that the special verdict as framed did not properly submit the issues to the jury. By the answer to question 1 the jury found that the defendant was negligent in failing to provide an adequate and suitable means for the passage of water in the case of floods which should have been foreseen by the defendant as likely to occur. This is a general finding. By answer to subdivision (a), the jury found that there was no failure to provide gates and spillways of sufficient capacity. This finding negatives the claim of the plaintiff that the dam in question was structurally inadequate or insufficient. The only negligence found by the jury is the failure of the defendant to open the gates in the Little Falls dam and the Willow Falls dam earlier in

the day than they were in fact opened. The duty of the defendant in that regard is affected by the character of the flood with which it was called upon to deal. On behalf of the plaintiff it is claimed that the flood was not "unprecedented." On behalf of the defendant it is contended that by the uncontradicted evidence the flood was shown to be unprecedented. This requires us to consider what is meant by an unprecedented flood.

In *Geuder, Paeschke & Frey Co. v. Milwaukee* (1911), 147 Wis. 491, 133 N. W. 835, the court had under consideration the duty of a municipality to provide sewers of sufficient capacity to carry off the surface water. The duty of a municipality with respect to the disposition of surface water is quite different from the duty which the owner and operator of a dam in a stream owes to the upper and lower riparian proprietors. The duty of a municipality is considered in *Hoyt v. City of Hudson* (1871), 27 Wis. 656. *Allen v. Chippewa Falls* (1881), 52 Wis. 430, 9 N. W. 284, deals with the same matter. In the *Milwaukee Case, Allen v. Chippewa Falls* was referred to, and in considering the duty of a municipality with respect to the disposition of surface water, rainfalls are divided into three classes, ordinary, extraordinary, and unprecedented. An unprecedented rainfall is defined to be such a rainfall as never, so far as known, definitely occurred before and so is not reasonably to be expected even at long intervals though not impossible. From this and other cases it is argued on behalf of the plaintiff that if the plaintiff established the fact that at some prior time at some point on the river a preceding flood had reached the same height as the flood in question, the flood in question was not unprecedented. This argument gives to the word "unprecedented" the full effect of the dictionary definition of that word. The use of the word "unprecedented" in this connection is perhaps unfortunate. A flood which exceeded

all other prior floods in extent of course is one which defendant is not required to anticipate. It is not the law that if a flood of most unusual proportions has occurred, a riparian is required in every case to anticipate and guard against a like flood in the future. The correct distinction was drawn by the court in *Goddard v. Chicago, B. & Q. R. Co.* (1910) 143 Wis. 169, 126 N. W. 666. In that case the court had under consideration the duty of a railroad company to provide adequate passage of water through a bridge which it constructed. This court said:

"But in connection with this question the court explained to the jury that they were to consider whether the flood was an unusual or extraordinary flood, explained the terms 'unusual' or 'extraordinary,' instructed that the railroad company constructing an embankment or bridge is not required to make provisions against such unusual or extraordinary floods as cannot be foreseen by men of ordinary experience and ordinary prudence in the locality where such flood occurs, but that the defendant ought reasonably to have anticipated all floods and freshets which occur annually or at longer intervals, and which, from having been known to occur at longer or shorter intervals, may be reasonably expected to occur again." See *Cobb v. Smith* (1875), 38 Wis. 21; *Sabine v. Johnson* (1874), 35 Wis. 185.

The action in that case was begun to recover damages caused by a flood which occurred in July, 1907. It was shown that similar floods had occurred in 1876, 1884, and 1900. It appeared therefore in that case that the flood was not of such character that the defendant should have anticipated and guarded against it.

In *Nashville, C. & St. L. Ry. v. Yarbrough* (1915), 194 Ala. 162, 69 So. 582, 584, the court said:

"An unprecedented flood may be defined as such an unusual and extraordinary rainfall as has no example or parallel in the history of rainfall in the vicinity affected, or as affords no reasonable warning or expectation that it will likely occur again."

One who obstructs the flow of a stream is not required to guard against floods of such unusual and extraordinary proportion as not to have been anticipated by a man of ordinary prudence and experience. To require riparians to guard against floods of such extraordinary proportions that they are not likely ever to occur again, would be clearly unreasonable. To illustrate, at Dayton, Ohio, in 1913, there was a flood of such extraordinary proportion that nothing of the kind ever had been known in that region in a century. It is now twenty-three years since that happened and no similar flood has occurred. It cannot be said under the law that riparians upon the Miami river are bound forever to anticipate that there will be another such extraordinary precipitation upon that area under similar conditions. Cases are collected and classified in a note, 59 L. R. A. 817, at p. 877, and 1918A Ann. Cas. 1114, at p. 1118.

The overwhelming weight of the evidence in this case establishes the fact that the flood in question was of a most extraordinary character and that nothing like it had ever been seen in the river prior to April 3d. The only evidence which tends to contradict this conclusion is the testimony of the witness, Curtis Cook, a former employee of the defendant. Referring to the flood in 1916, he was asked: "How high did it rise?" "A. I imagine there were four or five inches of water in the plant [at Willow Falls] at that time." On April 3d, it appeared that at the same point the water reached the height of five to seven inches. However this proves very little, if anything, with regard to the proportions of the flood in the river. The depth of water at a particular point may be affected by many things, the operation of the gates above and below, flood trash in the stream, such as ice, trees, and débris of all sorts. What is to be considered is the state of the flood in the stream as a whole. So considered the evidence without contradiction establishes that the flood in question exceeded any theretofore known on the river.

It was therefore of such extraordinary and unusual proportions that the defendant in the exercise of ordinary prudence was not required to anticipate it. .

The plaintiff contends here that it was the duty of the defendant company, when notified of flood conditions on the river at 6 o'clock in the morning of April 3d, to open its gates at the Little River Falls. It is further contended had it done so that the increased capacity of the pond above the Little Falls dam would have prevented the damage complained of. In this connection it is to be remembered that at 3 o'clock in the morning of April 3d, the plaintiff was calling upon the defendant to lower its pond created by the St. Croix dam below the Little Falls dam. There is no evidence in the record that at the time in question the Little Falls dam was not passing the flow of the stream. When later the water raised and it appeared that the openings were insufficient for that purpose, the gates were opened. After they were entirely opened, the level of the water fell two inches in the pond above Little Falls dam in two hours. After 6 p. m. it continued to rise with the gates entirely open. If the defendant had opened the gates of the Little Falls dam and had done as the plaintiff, a lower riparian requested it to do, an amount of water in excess of the flow of the stream would have been discharged. Had damage resulted, the defendant would have been liable. The defendant owed duties to upper as well as to lower riparians. Subject to its reasonable use, it was under a duty to pass the flow of the stream as it reached it in such manner to do no damage to either upper or lower riparians. *Boyington v. Squires* (1888), 71 Wis. 276, 37 N. W. 227; *Hackstack v. Keshena Improvement Co.* (1886) 66 Wis. 439, 29 N. W. 240.

Certainly it cannot lawfully be required to discharge the contents of its millpond in addition to the flow of the stream upon lower riparians and so make itself liable for resulting

damage. Upon the trial there was no effort to establish by expert evidence or otherwise the time when, as plaintiff claims, the gates should have been opened. Such evidence as there is indicates that the river was at a flood stage by 6 a. m.; that it remained at a flood stage; that when all of the gates were opened between 3 and 4 p. m., the pond fell at the rate of an inch an hour; but the evidence also shows that at New Richmond with all the gates opened and a break in the embankment and at the Mounds dam, the water continued to rise for four hours.

The plaintiff here contends that the defendant is liable because by opening the gates sooner it might have discharged a quantity of water which it withheld; that by reason of this withholding the dam broke and the retained water was let down upon the plaintiff. The uncontradicted facts disprove this conclusively. The discharge of the river at the time of the peak of the flood when it poured over the gates, spillway, and embankment for an hour or more must have amounted to very much more than any volume of water that could have been released by the opening of the gates. There is nothing in the evidence that indicates that all of the damage sustained by the plaintiff would not have been sustained however the gates were operated. Plaintiff was not required to anticipate an unprecedented flood. It was its duty to pass water through its dam as fast as it received it. The claim that the water withheld by failure to sooner open the gates, assuming it to be a negligent act, caused the injury, finds no factual support in the evidence. What effect, if any, this proportionately small volume of water had upon the property of the plaintiff is a matter of pure speculation and conjecture. The trial court correctly so held.

*By the Court.*—The judgment in each case is affirmed.