NEW ENGLAND MICA COMPANY *vs.* WALTHAM FACTORIES,
INC., & another.

Middlesex.   February 8, 1938. — July 1, 1938.

Present: DONAHUE, LUMMUS, QUA, & DOLAN, JJ.

*Prescription. Dam. Negligence,* In operation of dam. *Joint Tortfeasors.*
*Proximate Cause. Damages,* For tort.

The mere fact, that, for at least one month each year during a period
of more than twenty years water on premises about a mile upstream
from a dam had an elevation which would correspond to the mainte-
nance of thirty-six-inch flashboards on the dam, did not require a
finding that the owner of the dam had acquired a prescriptive right
to maintain flashboards at that height; and, where there was no evi-
dence as to the time when the flashboards were increased to that
height, a finding that no prescriptive right thereto had been estab-
lished was warranted.

Codefendants were liable for the negligence of their common agent in
charge of a dam, though as between them the duty of maintenance
and repair was on one only.

Evidence that the owner of a dam, with knowledge of impending danger
of flooding due to existing weather conditions, failed seasonably to
remove flashboards of height greater than he was entitled to main-
tain, and that such removal would have prevented flooding of factory
property a mile upstream, warranted a finding of negligence on his
part which resulted in damage to the factory.

Damages awarded for negligent flooding of a factory, causing suspension
of its operation for a period, ought not to include the entire profits
lost in that period where the work resulting in the profits was only
delayed, but as to that element should be measured by the loss caused
by the delay.

BILL IN EQUITY, inserted in a writ of summons and attach-
ment in the Superior Court dated June 11, 1936.

From a final decree entered by order of *Beaudreau,* J.,
the defendants appealed.

*R. C. Evarts,* (*W. A. Ryan* with him,) for the defendants.
*W. J. Bannan,* (*R. W. McEnaney* with him,) for the
plaintiff.

DOLAN, J.   This is a suit in equity, brought in the Superior
Court, to recover damages resulting from the flooding of

the plaintiff's land and factory buildings, in March, 1936, and alleged to have been caused by the negligent maintenance and operation, by the defendants, of the flashboards on a dam owned by the defendant corporation.* The case was referred to a master who reported thereon; it now comes before us on the defendants' appeal from the interlocutory decree confirming the master's report, and from the final decree entered in the court below ordering the defendants to pay to the plaintiff as damages $6,511 with interest and costs.

It is undisputed that, at the time of the flooding of the plaintiff's premises, flashboards were maintained at a height of thirty-six inches above the crest of the dam. In defence to the allegations of negligence the defendants contend that they had a prescriptive right to maintain the flashboards at that height. All the evidence relating to this issue is documentary and is reported. Accordingly the court may determine this question without giving weight to the conclusion of the master, which was adverse to the defendants' contention. See *Hopkins* v. *Flower*, 256 Mass. 367, 371, and cases cited. The evidence tends to show the following facts:

On March 12, 1936, the plaintiff was the owner of certain land and factory buildings thereon, situated on an inlet of the Charles River, at Waltham, about one mile westerly and upstream from the dam then owned by the defendant corporation. The defendant corporation on March 12, 1936, and for several years prior thereto was the owner of certain land and a group of factory buildings in Waltham, and of a dam across the Charles River near its factory buildings and appurtenant thereto. On May 16, 1935, the defendant Mitchell acquired title to a portion of the premises then owned by the defendant corporation, including the "wheel house," together with the right to use the dam, canal, sluiceway, penstock, and all riparian rights appurte-

---

* The bill also contained prayers that the defendants be restrained from fastening the flashboards so that they cannot be moved; that the defendants be directed to remove all fastenings "on said flash boards which prevent removal." Prior to the hearings before the master, however, the Metropolitan District Commission acquired all the rights, title and interest in the dam "and the flowage rights appurtenant thereto," and the plaintiff waived the prayers for injunctive relief.

nant to or used in connection with the water power development at the dam, which is commonly called the "Moody Street dam." By the acceptance of the deed of conveyance, she "covenanted and agreed 'to repair and maintain the dam, canal, bridges, sluiceway and penstock . . . and all property used in connection with the maintenance of the power privilege.'"

The dam, which is constructed of granite and back fill, was built in 1814. It is 170.2 feet long, 7.2 feet high, and its crest is at elevation 37.8, Boston base. (The Boston base is the basis of all elevations hereinafter referred to.) On the crest of the dam were several cast iron pilasters, thirty-six inches high, and twelve feet apart. On the easterly or downstream side at the bases of the pilasters a wooden beam eight by eight inches ran along the entire length of the dam. A catwalk extended the length of the dam at elevation 40.88 or thirty-seven inches over the crest of the dam. By grants made in 1815, 1859 and 1872 the predecessors in title of the defendant corporation acquired the right to maintain flashboards twenty inches high and to flow the grantors' lands to the extent to which the dam with flashboards at that height would flow them. None of the land comprised within these grants included that of the plaintiff. There have been no other conveyances of rights in land for flowage purposes to the defendants or their predecessors in title. There was evidence that in 1903, except in time of freshets, flashboards thirty or thirty and one half inches high were maintained, that the "pond" reached an elevation of thirty-nine inches above the dam almost every year, and that one Goodale, presumably a representative of the then owners, "felt" that the right to the extra ten inches of flashboards was secure, because it had been maintained for more than twenty years without protest. In a report of the department of public health in 1931, it is stated that the predecessor of the defendants had maintained a flowage of thirty-eight inches above the crest of the dam for many years, and that at that time thirty-eight-inch flashboards were in place. There was no evidence, however, before the master as to the time at

which the increase in height to thirty-eight inches was made.

The master found that "the plaintiff or its predecessors in title had no notice or knowledge of the maintenance by the defendants or their predecessors in title of flashboards on the dam at any height in excess of twenty inches, or any invasion of its property resulting therefrom; that the plaintiff did not suffer any actual injury by reason of the defendants maintaining flashboards on said dam at any height in excess of twenty inches prior to March 12, 1936; and that the exercise of the easement claimed by the defendants has not been open, adverse and uninterrupted for the period of twenty years prior to March 12, 1936." The defendants argue, however, that a prescriptive right has been acquired by the elevation of the flowage. There was evidence, as before related, that "for many years" a flowage of thirty-eight inches was maintained, and records were introduced to show that at least one month in each year from 1893 to 1935 the water had an average elevation of 40.8 or the elevation of thirty-six-inch flashboards above the crest of the dam. It is well settled, however, in this Commonwealth that the measure of the prescriptive right claimed is the efficient height of the dam, according to its structure and operation, to maintain the height of the water, when in repair and good order. It is not the actual flowage but this efficient height of the dam in its ordinary action and operation which measures and limits the claim of the mill owner to raise and appropriate the mill power of the stream. See *Ray* v. *Fletcher*, 12 Cush. 200, 208; *Cowell* v. *Thayer*, 5 Met. 253, 258; *Jackson* v. *Harrington*, 2 Allen, 242. "The height of the pond will ordinarily be variable and fluctuating, and can afford no safe rule to measure the rights of the parties." *Daniels* v. *Citizens' Savings Institution*, 127 Mass. 534, 536. We think that the defendants have not sustained the burden of proving their claim to a prescriptive right as to the plaintiff to maintain the flashboards at a height in excess of twenty inches above the crest of the dam. See *Jackson* v. *Harrington*, 2 Allen, 242.

The master also found that the defendants' premises and the dam were in charge of one Braude, who was admitted by them to be their agent, and that the defendants' negligence in the maintenance and operation of the flashboards was the cause of the injuries sustained by the plaintiff in its property.  The defendants contend that the master erred in finding both defendants negligent, emphasizing that the defendant Mitchell had "covenanted" with the defendant corporation to repair and maintain the dam.  But as it was admitted that the premises were in charge of Braude and that he was their agent, if Braude was negligent, both the defendants may be held liable.

The findings of the master upon which he based his conclusions as to the defendants' negligence need not be recited in detail at this point.  They will be stated in the discussion which follows.

The defendants have argued that the flooding of the plaintiff's premises was the result of an "act of God" for which they cannot be held liable; and that, even had they removed the flashboards or lowered them to not above twenty inches above the crest of the dam before March 12, the premises of the plaintiff would still have been flooded.  Pertinent findings of the master as to this issue, as well as to the issue of negligence, may be summarized as follows: In 1929, and prior thereto, handles were attached to the flashboards so as to permit them to be removed in sections. Subsequently, single boards, six feet long, were laid horizontally one on top of the other on the crest of the dam between the pilasters.  The outer ends of the boards rested against flanges in the pilasters and the inner ends rested against wooden uprights fastened to the beam before referred to. The boards were toe-nailed with two and one half inch nails to each other and also to the uprights.  In April, 1935, the river was rising rapidly; the defendants were then unable to remove the flashboards and the Waltham fire department was called to remove them and did so, under perilous conditions, in boats and by the use of "cant dogs" and "crow bars."

On February 16, 1936, a deputy chief of the Waltham

fire department went to the defendants' property in response to a call, and told the defendants' agent that "it was an opportune time to remove" the flashboards to avoid a recurrence of the extreme peril to which the members of the fire department had been subjected in removing them in April, 1935, when the rising waters endangered the defendants' properties. From March 3 to March 8, 1936, the water rose steadily from elevation 40.0 to 41.1. On March 8 it remained stationary. From March 9 to March 11 it rose to 41.7, remaining at that point on the eleventh. The top of the flashboards was at elevation 40.8. On the sixth, seventh and eighth of March the temperature was below freezing, and on the ninth, tenth and eleventh of March averaged from forty to forty-three degrees above zero. The defendants knew that the mill pond had a small storage capacity and would fill up very rapidly. Notwithstanding these threatening conditions, the warning given them in February, and their previous experience in April, 1935, they did nothing about removing the flashboards until March 11, when their efforts to do so were practically fruitless. On March 12 there was a rainfall of 2.55 inches, the average temperature was forty-seven degrees above zero, and the water rose before 1 P.M. to 42.9 feet or 0.4 feet higher than the plaintiff's premises. The fire department was called, boats were obtained from the metropolitan district commission, and the firemen and the defendants' employees removed the flashboards by the same means as were employed in April, 1935. The water started to flow into the plaintiff's factory, which is at elevation 42.5, in the forenoon of March 12, and continued to rise until March 19, when it reached a peak of 43.51. Due to the water in the plaintiff's factory, its operations were completely suspended until the eighteenth of March and full operations could not be resumed until March 25. The plaintiff used all reasonable efforts to minimize the effects of the flood. The master found that, had the defendants removed all the flashboards prior to March 8 or lowered them to twenty inches, the highest point which the water would have reached during the flood would have been 41.2

or 2.31 feet below the elevation on March 19, and would not have reached an elevation sufficient to overflow the plaintiff's premises. This was a question of fact to be determined by the master. See *Gray* v. *Harris*, 107 Mass. 492, 493. Even if it is assumed that the defendants had no duty to remove all the flashboards but had the duty only to lower them to twenty inches, no error appears. The elevation of flashboards twenty inches high was about three feet lower than the plaintiff's factory. The defendants have argued that, since, after the flashboards were lowered on March 12, the water continued to rise until the nineteenth and flowed the plaintiff's factory, to have lowered the boards earlier would not have prevented the flooding. In support of this contention they have referred to the testimony to that effect of one witness called by the plaintiff. All of the evidence bearing on the subject matter is not reported, and this fragment of the evidence cannot be regarded as controlling. In the light of the master's subsidiary findings, which are not mutually inconsistent or contradictory, we think that it cannot be said that his conclusion that the defendants were negligent in their maintenance and operation of the flashboards is plainly wrong, nor that the flooding of the plaintiff's factory was the "action of an irresistible physical force not attributable in any degree to the conduct of man." If the "action" of the force was reasonably preventable by human foresight, strength or care, as found by the master, the defendants, not having exercised such foresight, strength or care, were guilty of an "unreasonable failure to anticipate danger, to put forth appropriate preventive measures . . . or to employ rational means to ward off the probable consequences of the event," and their failure so to do became a contributing cause of the injury sustained for which they are responsible. *Hecht* v. *Boston Wharf Co.* 220 Mass. 397, 402. See *Gray* v. *Harris*, 107 Mass. 492; *Navien* v. *Cohen*, 268 Mass. 427, 431; *Goddard* v. *Berlin Mills Co.* 82 N. H. 225, 227; *Bennington* v. *Fillmore & Slade*, 98 Vt. 405, 421.

In the matter of damages the master found that, because

of the defendants' negligence in not seasonably removing the flashboards in excess of twenty inches, the plaintiff sustained damages to the amount of $6,511. This amount was the total of two items: expenses in pumping and controlling the water in the factory and other miscellaneous expenses incurred to enable operations to be resumed, $2,037.08; and loss of profits due to the interruption of operations, $4,773.92. These items total $6,811 and not $6,511 as found.

The defendants admit that if the plaintiff is entitled to recover at all there is no dispute as to the item of expenses. The finding of the master as to this item ($2,037.08) is, therefore, to stand. They contend, however, that the finding as to the loss of profits is erroneous.

The master found that the plaintiff's business was more or less seasonal and that as a rule the "heavy months . . . [were] December, January, February and March." On March 4, 1936, a very large order was received and others thereafter, and the factory has been running at full capacity since that time.

In assessing damages the master, by subtracting expenses from sales, found an actual net profit of $1,817.07 for the month of March. He found that, if operations at the plaintiff's factory had not been interrupted during that month, the amount of sales on March orders which were not completed in March but which were completed in the first week of April, plus the actual sales in March, would have been $39,856.23. The total cost to the plaintiff of the actual March sales plus those on March orders completed in the first week of April would have been $33,265.24. The profit thus computed would have been $6,590.99, set out in the record as $6,580.99, the latter figure being incorrect. Subtracting from the correct amount the actual March profit of $1,817.07, the master found damages of $4,773.92 from loss of profits. There is nothing to show, however, that any loss of profits was sustained by the plaintiff by virtue of the fact that in April the work was done which but for the flooding of the plaintiff's factory would have been done in March.

The master stated that he followed the rule of damages set forth in *Lowrie* v. *Castle*, 225 Mass. 37, 51, which is that prospective profits may be recovered when they have been irrevocably lost and the loss appears to have been the direct result of the wrong of the defendant and is capable of proof to a reasonable degree of certainty.

Despite the master's statement that he followed this rule, his findings indicate that he did not follow it, but rather was influenced by a consideration of the time of the realization of profits, which is not an element of the rule just referred to, which applies where profits have been lost and not merely delayed. "Interruption of business and deprivation of [useful] possession of . . . property are elements of damage for which the . . . [plaintiff is] entitled to recover." *Potier* v. *A. W. Perry, Inc.* 286 Mass. 602, 606, and cases cited. The only evidence reported and the findings of the master in connection with this subject matter do not sustain his general finding as to loss of profits by the plaintiff. In these circumstances we are unable to ascertain the amount of damages sustained by the plaintiff because of the interruption of its business. Accordingly the decree is reversed and the case remanded to the Superior Court for the reassessment of damages sustained by the plaintiff because of the interruption of its business.

*Ordered accordingly.*