HOOSAC TUNNEL AND WILMINGTON RAILROAD COMPANY *vs.* NEW ENGLAND POWER COMPANY.

Suffolk.    January 7, 1942. — June 22, 1942.

Present: FIELD, C.J., QUA, DOLAN, & RONAN, JJ.

*Negligence,* Dam, General principles. *Water. Dam. Evidence,* Interrogatories, Presumptions and burden of proof, Matters of common knowledge, Judicial notice.

Extraordinary flood conditions accompanying the hurricane of September 21, 1938, were a matter of common knowedge, of which this court took judicial notice.

A party putting in evidence the opposing party's answers to interrogatories is bound by them if there is no evidence to contradict them.

Whether given conduct is negligent is to be determined, not alone with reference to its probable effect upon a person who is actually injured by it, but also with reference to the probable effect upon other persons of the possible alternative conduct. Per QUA, J.

Evidence of the circumstances in which the defendant, owner of a dam
on a river at a narrow gorge, during unprecedented hurricane and
flood conditions amounting to vis major, kept open sluice gates lo-
cated in the dam at such an angle that water flowing through them,
with water pouring over the crest of the dam, formed a powerful
current which washed away the plaintiff's railroad running along the
opposite side of the river, including evidence, binding on the plaintiff,
that the defendant acted in accordance with "the best judgment
and experience and the usual and approved practice . . . in the best
interests of all riparian owners both above and below" the dam,
did not warrant a finding of negligence of the defendant.

TORT. Writ in the Superior Court dated November 21,
1938.

The action was tried before *Walsh,* J., who reported it.

*E. R. Bonitz,* (*W. Kopans* with him,) for the plaintiff.

*D. E. Hall,* (*D. J. Donahue* with him,) for the defendant.

QUA, J. The declaration alleges that on September 21,
1938, the plaintiff's roadbed at Monroe was washed away
and its track was destroyed by reason of negligence of the
defendant (first count) "in the operation, maintenance and
control of the gates," or (second count) "in the operation
and control of the appurtenances" of its dam and power
plant on Deerfield River. It is contended, and there was
evidence to show, that the plaintiff's track was undermined
and caused to fall by the outflow from two sluice gates,
each approximately eight feet square, placed at the base
of the dam on the westerly side of the river at such an angle
that the stream emerging from them, coming in contact with
the main stream pouring over the crest of the dam, pro-
duced a powerful current that crossed the river diagonally
and impinged upon the railroad embankment on the east-
erly side. The judge directed a verdict for the defendant
on each count.

The plaintiff's railroad is located in "a very mountainous
region." Photographs which are part of the record show
plainly that at "Monroe Bridge," where the damage in
question occurred, the river runs through a narrow defile
or gorge, and that the railroad closely parallels the river,
being located high upon a steep hillside. Different wit-
nesses estimated the height of the railroad above the river
bed at from fifty to seventy feet.

September 21, 1938, was the date of the great hurricane. No one who experienced the severity of that storm will be likely to forget it. That it was preceded and accompanied, particularly in the western part of this Commonwealth, by torrential rains and extraordinary floods beyond all reasonable expectation is matter of common knowledge. The valleys of the Deerfield and of other nearby rivers lay in the region of heaviest precipitation. On these streams many dams and bridges failed, buildings were swept away, and fields and meadows were covered with gravel and débris. Railways and highways using the valleys were washed away in many places, buried by landslides at other points, and rendered incapable of operation for long periods. Repairs were effected and normal conditions fully restored only after long delay and with great effort and at huge expense. During the following month a special session of the Legislature was held, and large sums were appropriated by emergency acts for the repair of highways, the removal of obstructions from streams, and the repair of dams. See St. 1938, c. 505, c. 506, and Res. 1938, c. 92.

The evidence in the case, all of which was introduced by the plaintiff, merely tends to confirm common knowledge and to prove that storm and flood raged at "Monroe Bridge" with the same violence as elsewhere in the region. A locomotive engineer who had lived in the vicinity for about fifty years and who had been employed on the plaintiff's railroad for thirty-eight years testified that it "rained quite hard" for several days; that there had been "heavy rain" on the twentieth; that it rained "a great deal" on the twenty-first; that by the morning of the twenty-first the bank was almost entirely filled with water; that water was "shooting" across the river bed into the bank on the railroad side with more force than he had ever seen before; that he had probably never seen such a storm as there was after noon of the twenty-first; that he knew a landslide on the Boston and Maine Railroad just below Hoosac Tunnel (also in the Deerfield Valley a few miles below "Monroe Bridge") had taken twenty-seven cars "right out of a freight train and buried the tracks out there for weeks";

that he had never in his thirty-eight years on the plaintiff's line seen such destruction as he saw in going over the line on the twenty-second; and that traffic was not resumed until November 7. A witness of ten years' experience at "Monroe Bridge" testified that until noon of the twenty-first the water did not rise beyond levels that he had frequently seen, but by late that afternoon there was "a tremendous flood of water" coming over the dam, such as he had never seen before, and the water came from the sluice gates at much higher velocity than on any previous occasion. Another witness of eleven years' experience testified that he had never seen so much water in the river as there was on the twenty-first; that there was a great deal more water coming from the gates than he had ever seen before; and that he had never seen it "contact the bank" as it did that day. The plaintiff's superintendent testified that the plaintiff's track was obstructed by twelve landslides and wash-outs in a distance above and below "Monroe Bridge" which the engineer testified was eleven miles.

In addition to the testimony of witnesses the plaintiff introduced in evidence the defendant's answers to the plaintiff's interrogatories. In answer to an interrogatory as to the reason for opening the sluice gates on September 21, the defendant replied, "For some days before September twenty-first there had been continuously heavy precipitation of rain in the western Massachusetts area with the result that the soil was so thoroughly saturated with water that the rainwater ran off the precipitous mountain slopes into brooks and channels tributary to the Deerfield River as well as into the Deerfield River itself about as fast as the rain fell. The result of all this was high water conditions in both the brooks and the river. On September twentieth, with the brooks and river already high, the Weather Bureau predicted further rains which in fact materialized, with the result that the Deerfield River and all tributary streams continued to rise and the rise developed the following day into the worst flood conditions of historical record in this and the general western Massachusetts area. Report of continuing precipitation and

further rises of rivers were received during the early morning of September 21, 1938, together with Weather Bureau reports and news items which predicted two more days of heavy rain or torrential downpours. The gates were opened on the morning of September twentieth and again on the morning of September twenty-first in order to remove the flashboards from the dam. This work of removing the flashboards was completed at approximately 11:40 A.M. September twenty-first, and the gates were kept open because the waters were continuing to rise. Every riparian owner on the Deerfield River and its tributaries was faced during the day on September 21, 1938, with absolutely unprecedented conditions. Whether it was better that all of the flood waters should pass over the crest of the dam or that part of the flood waters should be passed off at a lower level by keeping the gates open, was an emergency question, the answer to which was necessarily based upon judgment and such experience as had been acquired in other freshets and floods. Pursuant to the best judgment and experience and the usual and approved practice under flood conditions, the sluice gates were kept open in the best interests of all riparian owners both above and below the Monroe Bridge dam." Except as to the alleged removal of the flashboards, this answer was not contradicted by other evidence, and having been introduced by the plaintiff, became binding upon it. *Minihan* v. *Boston Elevated Railway,* 197 Mass. 367, 373. *Washburn* v. *R. F. Owens Co.* 258 Mass. 446, 448, 449. *Gordon* v. *Bedard,* 265 Mass. 408, 411. *Lydon* v. *Boston Elevated Railway,* 309 Mass. 205, 207, 208.

Common knowledge, of which we take judicial notice, and the evidence in the case, including that by which the plaintiff is bound, point to the conclusion that the flood in Deerfield River by the afternoon of September 21, 1938, had become a vis major or act of God. *Bratton* v. *Rudnick,* 283 Mass. 556, 561. *Bridgeport* v. *Bridgeport Hydraulic Co.* 81 Conn. 84. The fact that it had become such is not necessarily decisive of the defendant's liability for negligence. Even though the flood was in itself so extraordinary

that it should be classed as a vis major or an act of God, it might still be possible for the defendant to injure the plaintiff through negligence "in the operation, maintenance and control of the gates" or "in the operation and control of the appurtenances" of its dam. *Hecht* v. *Boston Wharf Co.* 220 Mass. 397. *Bratton* v. *Rudnick,* 283 Mass. 556, 561. *New England Mica Co.* v. *Waltham Factories, Inc.* 301 Mass. 56, 62. It was the duty of the defendant at all times, including the afternoon of the twenty-first, to exercise the care of an ordinarily prudent dam owner under the circumstances. *Shrewsbury* v. *Smith,* 12 Cush. 177. *Wendell* v. *Pratt,* 12 Allen, 464, 471. *Gray* v. *Harris,* 107 Mass. 492. *Bryant* v. *Bigelow Carpet Co.* 131 Mass. 491, 502. *New England Mica Co.* v. *Waltham Factories, Inc.* 301 Mass. 56, 62. But the burden of proof was upon the plaintiff, and in passing upon the issue of negligence the extraordinary natural phenomena which indisputably confronted the defendant on the afternoon of September 21 constitute a factor of paramount importance.

The plaintiff's principal contention is that the defendant was negligent in not closing the sluice gates. There was evidence from the plaintiff's expert witness, in substance, that if the gates had been closed the current would have flowed on down stream instead of wearing away the plaintiff's embankment. But under ordinary flood conditions no harm would have resulted from leaving the gates open, and there is no evidence that the current had begun to wear the embankment until the extraordinary conditions of the afternoon of the twenty-first had come about. By that time circumstances were altogether abnormal. There was no evidence that an ordinarily prudent dam owner would have allowed the sluice gates to be closed under the conditions then existing, whatever might be the effect upon the plaintiff's embankment of leaving them open. It is obvious that to close the gates at that time would have still further raised the water behind the dam and would have increased the flooding of lands above as well as the torrent already pouring over the crest of the dam. It would have increased the pressure upon the dam itself, possibly to the point of

imperilling the whole valley below. The plaintiff's expert testified that "Under certain circumstances it would be quite necessary" to keep the gates open to relieve pressure back of the dam, and that it was also wise to provide such gates to prevent flooding of the country above the dam. There is much in the evidence to suggest that due care for the safety of the valley required the sluice gates to be kept open, and there is no evidence that under the circumstances it would have been safe or prudent to close them. A finding to that effect could be warranted only by adequate evidence as to various matters, such as the manner of construction and strength of the dam, the pressure behind it, the effect upon the flow of the river above and below and upon the property of riparian proprietors, as to all of which the record is silent. It may well have been a matter requiring expert opinion. Moreover, there was no evidence to contradict the defendant's answer to the plaintiff's interrogatory, put in evidence by the plaintiff, that the defendant, faced by "absolutely unprecedented conditions," acted in accordance with "the best judgment and experience and the usual and approved practice . . . in the best interests of all riparian owners both above and below the Monroe Bridge dam." Whether given conduct is negligent is to be determined, not alone with reference to its probable effect upon a person who is actually injured by it, but also with reference to the probable effect upon other persons of the possible alternative conduct. Am. Law Inst. Restatement: Torts, § 295. See *Trout Brook Co.* v. *Willow River Power Co.* 221 Wis. 616, 626, 627; *Campbell* v. *Race*, 7 Cush. 408, 411. *Cooley* v. *Public Service Co. of New Hampshire*, 90 N. H. 460, 466.

The plaintiff further suggests that the defendant could be found negligent in not having removed more than a small part of the flashboards. The defendant's answer to interrogatories to the effect that it did remove all the flashboards on the forenoon of the twenty-first was contradicted by the plaintiff's witnesses. If the jury had believed the plaintiff's witnesses, it would still have remained a matter of conjecture whether the failure to remove the greater

part of the flashboards was negligence of which the plaintiff could complain. The plaintiff's expert testified that if the flashboards had been removed the water shooting at an angle from the sluice gates "would not be quite so high" and that "there would probably have been less waves," but that the "tail water" would have been "a considerable number of feet higher" and would have gone higher up the bank, and that there might possibly have been three times as much water in the "main river." What effect this would have had upon the plaintiff's embankment and upon proprietors below did not appear. Moreover, the evidence of the plaintiff's witnesses tended to show that if the flashboards were in fact left on, they were entirely swept away by the flood, as indeed might be expected, and there was no evidence whether they were carried down before or after the washing away of the plaintiff's embankment began.

The difficulties in the plaintiff's case may be epitomized in the statement that while it supplies evidence of that which might have been negligent under normal conditions, it also discloses beyond possibility of dispute utterly abnormal and unprecedented conditions, without supplying evidence that the defendant's conduct was negligent in view of the extraordinary conditions thus positively disclosed.

In accordance with the stipulation of the parties judgment is to be entered for the defendant on the verdicts.

*So ordered.*