ERNEST G. TAFT & another *vs.* BRIDGETON WORSTED COMPANY.

Worcester.    September 25, 1923. — October 13, 1923.

Present: RUGG, C.J., BRALEY, DeCOURCY, PIERCE, & JENNEY, JJ.

*Watercourse*, Riparian rights.  *Ice.  Actionable Tort.  Unlawful Interference. License.  Practice, Civil,* Variance.  *Damages,* In tort.

The owner of a milldam on a nonnavigable stream, who, by a reservation in a deed from a common predecessor in title of himself and of the owner of land next above his on the stream, had been given a right to maintain the dam and the head of water and by a grant of the upper owner had been given "the right and privilege to flow" that land, has not an absolute right at will and at any time to draw the water out of a pond thus formed on the land of the upper riparian owner by means of his gates; and if, at a time when such upper riparian owner is harvesting ice on the pond on his land, the owner of the dam, not in the course of a reasonable use of the water but merely for the purpose of preventing the harvesting of such ice, draws off the water, ruins the ice and prevents its being harvested, he may be found to be liable to the upper riparian owner in an action of tort for damages so caused.  Following *Taft* v. *Bridgeton Worsted Co.* 237 Mass. 385.

In the declaration in an action by the upper riparian owner to enforce such a right, the plaintiff alleged that there was on his property "a pond, the flowage rights in which are claimed and alleged to be owned by the" de-

fendant.  *Held*, that there was no variance between such an allegation and the proof, above described, that the defendant's rights rested upon express reservation and grants.

The plaintiff in the action above described was not entitled to recover damages for the loss of ice which he was intending to harvest from a portion of the pond over land of another riparian owner from whom he had received only a revocable license to harvest the ice, given him without consideration and not as an incident to an executory contract of sale.

Tort for unlawful interference with the harvesting of ice and for the destruction of harvestable ice upon a mill pond on land of the plaintiffs above a dam maintained by the defendant on its land.  Writ dated June 30, 1919.

The action previously was before this court when, by a decision reported in 237 Mass. 385, on an appeal by the plaintiffs from a judgment for the defendant following the sustaining of a demurrer to the declaration, the judgment was reversed.

There was a trial in the Superior Court before *Burns*, J. Material evidence and exceptions saved by the defendant are described in the opinion.  The jury found for the plaintiffs in the sum of $34,637.68; and the defendant alleged exceptions.

*G. S. Taft*, (*E. G. Norman* with him,) for the defendant.

*H. Parker*, (*J. M. Thayer* with him,) for the plaintiffs.

Pierce, J.  The allegations in the declaration in substance are that the plaintiffs are the owners of a parcel of land upon which there is a pond, " the flowage rights in which are claimed and alleged to be owned " by the defendant; " that the said defendant maintains and uses exclusively in connection with and for the operation of its mill for the manufacture of textile fabrics a certain dam to maintain said flowage for the said operation of said mill; " that the cutting and harvesting of ice by them (the plaintiffs) " on or about January 13, 1919, and at any and all times during the season of ice formation, would not and did not, in anywise, impair or interfere with any lawful use of, or right to the waters of said pond in the defendant or belonging to it; " that " the proper, ordinary, reasonable and necessary use of the water in said pond and above said dam by the defendant for the purpose of operating its said mill

on or about said thirteenth day of January, 1919, or at any period of ice formation, would not materially have injured the plaintiffs in their use and enjoyment of their lawful rights to cut, harvest and sell the ice formed on said pond upon the premises of the plaintiffs;" that the defendant " well knowing the premises but maliciously contriving and intending to hinder and deprive the plaintiffs of the profit and advantage of cutting, harvesting and selling the ice formed upon the pond as aforesaid, and unjustly intending to aggrieve the plaintiffs, on or about the thirteenth day of January aforesaid, and at various times thereafter through its officers and employees or other agents, without reason or necessity and in total disregard of the rights of the plaintiffs, opened the sluiceway and gate of said dam and thereby caused the water to flow out of and away from said pond, whereby the ice formed and forming on said pond during the ice season and about to be cut and harvested by the plaintiffs for use in their business as aforesaid, was settled and precipitated to the bottom of said pond, upon and into the mud, and rendered incapable of being cut and harvested and wholly unsaleable and of no value to the plaintiffs;" that the " defendant . . . so carelessly, negligently, wastefully and improperly used and drew the water from said pond, and so carelessly, negligently, and unnecessarily opened and allowed to remain open the sluiceway and gate of said dam, that the water was caused to flow out of and away from said pond, whereby the ice formed and forming on said pond during the ice season and about to be cut and harvested by the plaintiffs for use in their business . . . was . . . rendered incapable of being cut and harvested."

The plaintiffs introduced evidence consistent with and conformable to the allegations in the declaration and which the jury would be warranted in finding established facts which in substance and succinctly stated are as follows:

At the time of the injury complained of the defendant was the owner of land in Uxbridge in the county of Worcester, through which the Rivulet Stream flowed and upon which was a textile mill with a dam.   The plaintiffs owned land

on said stream higher up and adjoining the land of the defendant. On the dividing line between the land of the plaintiffs and defendant was another dam, called the Reservoir dam.

Until June 24, 1856, one Thayer owned the land subsequently acquired by the plaintiffs and the land subsequently acquired by the defendant which adjoined the land acquired by the predecessor in title of the plaintiffs. On that date Thayer conveyed the land acquired by the plaintiffs to one Burrill, "Always, however, reserving to the grantor his heirs and assigns said old dam called the Reservoir dam with the right to maintain the same forever at its present height, and to keep up and maintain a head of water to the height the same has at any time been kept up or maintained thereby, free from rent or charge for damages for flowage or for maintaining said dam."

On October 1, 1858, " Thayer conveyed his remaining land to Chandler Taft, a predecessor in title of the defendant, 'including all the right, appurtenances and privileges reserved in my deed to Amos C. Burrill to the preservation and use of water at the reservoir which is on said Burrill's land.' "

Burrill, by deed dated May 26, 1864, conveyed to Chandler Taft "the right and privilege to flow my real estate, which I purchased of Joseph Thayer, lying West of the land of said Chandler Taft and land sold by Joseph Thayer to Mr. Russell, and upon the Rivulet Stream between the Reservoir and the Rivulet Dam, as high as the high water mark designated by a drill hole in a rock situated in the Rivulet Pond."

January 14, 1871, Burrill conveyed to Richard Sayles and another (purchasers from Chandler Taft) " the right and privilege to flow such of my land lying Westerly and Northerly of the land and water power of said Sayles & Taft on the Rivulet Stream, so called, in said Uxbridge as may be in any way flowed by the dam of said Sayles & Taft, at its present height, being by measurement three feet higher than the drill hole in the large rock in the Southerly part of the Rivulet Pond, being the same drill hole referred to in the deed of Amos C. Burrill to Chandler Taft dated May

26, 1864 & recorded in Registry of Deeds Book 685, Page 241. And I hereby release all my claims against said Sayles & Taft or Richard Sayles for past, present or future damage for flowing any of my land by their dam at its present highth [*sic*] three feet higher than said drill hole."

These flowage rights were acquired by the defendant when it purchased its property in 1912. There was no natural pond on the plaintiffs' or defendant's land. The pond referred to in the declaration, as a pond upon the premises of the plaintiffs, was created wholly by said Reservoir and Rivulet dams, referred to in the deeds hereinbefore cited. The mill and dam upon the defendant's premises were built many years ago by a predecessor in title of the defendant. The mill had always been used by its owners for the manufacture of textile goods. The mill pond had supplied power, used in conjunction with other power, for the operation of the mill. The pond created by the flowage of the dams used in such operation covered between seventeen and eighteen acres of land, six acres immediately above the dam belonging to the defendant and its predecessors in title and the remaining land belonging to the plaintiffs and their predecessors in title, except about one and three fourths acres which belonged to one Bryant.

" The plaintiffs built an ice house upon their own land on the shore of said pond, with appliances for the cutting, harvesting and storing of ice therefrom, for the wholesale and retail ice business in which they were and had been ever since engaged. A spur railroad track, connecting with the New York, New Haven and Hartford Railroad, was available to and was used by the plaintiffs for shipment of ice directly from said ice house. The immediate predecessor in title of the plaintiffs had carried on a similar ice business on substantially the same site for a period of about seven years before the plaintiffs acquired the property. Prior to the winter of 1918–1919, the plaintiffs had harvested and stored their ice without any interference, by reason of any drawing down of the waters of the pond by the defendant or its predecessors during the ice cutting season. The plaintiffs had furnished ice without charge to two of the officers of

the defendant corporation each year after the defendant acquired the mill property, upon the agreement of the defendant not to draw down the water in the pond during the ice-harvesting season, and for the privilege of the plaintiffs of occasionally cutting ice from the part of the pond over land belonging to the corporation. The value of the ice thus furnished was about $200 for a year."

In October, 1918, Jowett, the president and manager of the defendant company, told the plaintiffs in substance that as the Electric company, from which the defendant company purchased power for the operation of its mill, had raised the power rate, the defendant must get more from the plaintiffs than it had been getting. The plaintiffs replied that the defendant was getting all it deserved, and Jowett then said that the defendant had the right to draw off the water at its will. This talk was followed by a letter from Jowett to the plaintiffs, telling them that on account of the advance in the power rate " we are compelled to advance our price to you for cutting ice on our pond," and enclosing an " invoice " " rent for cutting ice, $500." This was followed up by " statements " sent by Jowett to the plaintiffs in November and December, when the plaintiffs wrote the defendant that they maintained that they had the right to cut ice when they owned the land around and under the pond without paying for it. Jowett replied " We have no objection, whatsoever, to your cutting the ice."

On January 13, 1919, when the ice was eight inches thick, the water was drawn down two feet from flowage level. On January 16, the plaintiffs protested to Jowett against the drawing down of the water. He said " 'I can draw the water off if I please,' to which one of the plaintiffs replied ' I will hold you liable if you do.' " One of the plaintiffs then said to Jowett, " 'You are drawing down the water and I have a right to have it kept up.' Jowett replied ' I have a right to draw it off when I want to, and if you don't come through with $500, I can draw off all the water I want to and could take down the dam if I want to.' "

The plaintiffs' evidence would warrant the jury in finding that on February 10, the pond was full and the plaintiffs

began ice cutting; that the water began to go down and continued to go down till the afternoon of February 12, when the ice upon the part of the pond over the plaintiffs' land was upon the bottom of the pond and the plaintiffs were obliged to abandon work; that four hundred and fifty-three tons of ice were harvested February 10–12; that the storage capacity of the ice house was six thousand eight hundred and twenty-seven tons above one thousand four hundred and twenty-two tons of old ice which had been carried over from the previous winter; that it would have taken eight days to have filled the ice house under favorable conditions, and that the conditions from February 10 to 18 were favorable; that thereafter, by reason of temperature and other conditions, no further harvesting was possible; that one thousand tons of twelve-inch ice can be cut from an area of one acre; that the defendant's officers caused the wheel gate in the penstock to remain open the nights of February 10 and 11 while the mill was not in operation and caused the floodgate near the bottom of the dam to be opened a portion of the time between February 10 and 12; that between early evening of February 10 and 7 A.M. of February 11, the water was drawn down more than thirteen inches; that the sole purpose of the defendant's officers " in causing said floodgate to be opened and in allowing said wheel gate to remain open nights was to prevent the plaintiffs from harvesting ice."

The defendant requested the court to instruct the jury that upon all the evidence, the plaintiffs could not recover; and requested the following specific instruction: .

" Inasmuch as there were no limitations or restrictions upon the use of the water contained in the deeds which conveyed the flowage rights to the defendant's predecessor in title, the defendant had the absolute right at any time to draw the water out of said pond by means of its gates without incurring any liability to the plaintiffs for so doing."

The court refused to thus instruct the jury, and instructed them as follows:

The defendant's rights of flowage must be limited by the wants and requirements of its mill. This use of the

water is not unlimited. The rights and interests of the owners above, as of the plaintiffs, are to be equally regarded. The defendant, though owner of the easement of flowage, is not at liberty to consult his own interests or whims only as to when and in what quantity he shall let out the water thus accumulated."

The defendant excepted to the refusal of the court to instruct the jury as requested and to the instruction given and to so much of the court's charge as was inconsistent with the instructions which were requested and refused.

There were more than six thousand eight hundred and twenty-seven tons (the storage capacity of the plaintiffs' ice house for new ice) upon the part of the pond on the plaintiffs' land, and the plaintiffs had a license to cut ice on the part of the pond belonging to said Bryant. The plaintiffs introduced evidence that the ice upon the pond which was in excess of the storage capacity of the plaintiffs' ice house had a value of from $1 to $3 per ton for stacking purposes and claimed damages for the ice which was destroyed on the part of the pond belonging to them in excess of said six thousand eight hundred and twenty-seven tons and for the ice which was destroyed on the part of the pond belonging to said Bryant. No money or other consideration was given by the plaintiffs for the license to cut ice on the part of the pond upon Bryant's land.

The defendant requested the court to instruct the jury that the plaintiffs could "not in any event recover for any ice on the Bryant land." The court refused to thus instruct the jury and the defendant excepted.

The charge contains no reference whatever to the ice over the part of the land belonging to Bryant, and does not clearly limit the plaintiffs' right to recover damages to the injury to ice which was only over the land of the plaintiffs.

It is plain that the case above presented upon the declaration and the facts proved in support thereof is one where the defendant by grant has acquired an easement to create an artificial condition of flowage upon the land owned by the plaintiffs. The substantial question at issue is: may such owner of such an easement of flowage through mere

caprice abate conditions which he has created, at a time when he knows that such act will inevitably cause serious pecuniary damage to the right which is incident to the ownership of the servient estate, to use and consume the waters in liquid or in congealed form, which are impounded on his land, or which pass his land, if such use and consumption can be had or exercised without legal injury to the owner of the easement.

We perceive no substantial variance between the proof that the defendant's rights of flowage rested upon grants, and the averment in the declaration that on the premises (of the plaintiffs) " there is a pond, the flowage rights in which are claimed and alleged to be owned by the Bridgeton Worsted Company," the defendant; nor discern any sound reason which supports the defendant's suggestion that the court, in the absence of evidence of a deed of grant, would assume the title of the defendant and the measure of its right were such as may be acquired by prescription or under the mill act. Assuming the right of the defendant to flow the lands of the plaintiffs rests upon grants, as distinguished from rights acquired by prescription or under the mill act, the evidence in its outstanding features is entirely consistent with the allegations of the declaration that the flowage rights in the plaintiffs' pond are claimed and alleged to be owned by the defendant. This case, in every substantial feature, is governed by the decision ' of this court upon a demurrer to the declaration in *Taft* v. *Bridgeton Worsted Co.* reported in 237 Mass. 385, the reasoning of which need not be repeated here. It follows therefrom that the request of the defendant for a directed verdict was refused rightly.

The request for a ruling that " The plaintiffs cannot in any event recover for any ice on the Bryant land " should have been given in form or in substance. The plaintiffs under the Bryant license, which upon the evidence was given without consideration and was not an incident to an executory contract of sale, had no right of property in respect to which the license was given and no standing in court to complain of an injury to property which they did not and

might never own.   The damage to their right to exercise their revocable license was a damage which the law does not recognize as an injury to their property.   *Walker Ice Co.* v. *American Steel & Wire Co.* 185 Mass. 463, 484, 485. *Handforth* v. *Maynard,* 154 Mass. 414.   *Richards* v. *Gauffret,* 145 Mass. 486.   *Balcom* v. *McQuesten,* 65 N. H. 81.   *Ottawa Gas-Light & Coke Co.* v. *Thompson,* 39 Ill. 598.

It follows that all the exceptions, except the one taken to the failure of the judge to charge that " The plaintiffs cannot in any event recover for any ice on the Bryant land," must be overruled; and the exception to such refusal must be sustained.

Exception sustained; case to stand for rehearing on the question of damages only.

*Exception sustained.*