FRANK B. DAVENPORT, executor, *vs.* TOWN OF DANVERS.

Essex. April 3, 1957. — May 14, 1957.

Present: WILKINS, C.J., RONAN, SPALDING, COUNIHAN, & CUTTER, JJ.

*Adverse Possession and Prescription. Easement. Dam. Water.*

The record in a suit in equity against a town which had acquired a mill site and dam on a brook, together with mill privileges, justified conclusions that for far more than twenty years successive owners of the site had maintained the dam, and thereby flooded land located above it, continuously, openly and notoriously, and presumably under a claim of right and adversely to the owners of the flooded land in the absence of anything to show the contrary, for general purposes and not merely for mill purposes, and that the town had a prescriptive right to maintain the dam and to flood the land above it for the purpose of storing the water of the brook in connection with the town's water supply. [111–113]

Davenport *v.* Danvers.

In a suit in equity against a town owning a mill site and dam on a brook, together with mill privileges, the record showed no intentional abandonment by the town or its predecessors in title of prescriptive rights acquired to maintain the dam and thereby to flood certain land above the dam for general purposes, nor any extinguishment of such rights by lapse of time or by affirmative acts inconsistent therewith, although mill operations had ceased eighteen years before bringing of the suit. [114]

BILL IN EQUITY, filed in the Superior Court on March 1, 1954.

Following the decision of this court reported in 332 Mass. 580, respecting the defendant's demurrer, the suit was heard on the merits by *Lurie, J.*

*James A. Liacos,* for the plaintiff.

*William B. Sullivan, Jr.,* Town Counsel, for the defendant.

CUTTER, J.   The present plaintiff is the executor of the will of Francis B. Wilkins who prior to his death in 1954 owned three parcels of land in Middleton near Emerson Brook, a nonnavigable stream.   The town of Danvers (hereinafter called the town) in 1950, acting under authority of St. 1926, c. 200, purchased from two brothers named Currier land, also in Middleton, situated below the Wilkins lots on the brook.   The deed to the town purported also to grant a mill site and dam, together with the mill privileges.   The town rebuilt the dam and now uses it to store the winter flow of Emerson Brook, so that it may be pumped into the town's water supply reservoir, some distance away.   The town has made no formal taking by eminent domain of any easement to flood the Wilkins lots, which in winter are partly covered with water held back by the dam.   The town, however, has taken the right to divert the waters of Emerson Brook.

Wilkins in 1953 served notice on the town to desist from flooding his land.   He then brought this bill in equity to enjoin the flooding and to assess the damages caused thereby. After Wilkins's death, his executor was substituted as plaintiff.

This court, in *Davenport* v. *Danvers,* 332 Mass. 580, held that the town's demurrer should have been overruled.   The

case was then heard in the Superior Court on the merits. A final decree was entered dismissing the bill. The plaintiff appeals. The material parts of the evidence are designated as parts of the record under Rule 2 of the Rules for the Regulation of Practice before the Full Court (1952), 328 Mass. 693–694, or are printed, as provided in Rule 2, as an appendix to the town's brief.[1]

The trial judge found the following facts. "[A] dam . . . at the . . . present dam location [had been maintained] for more than twenty years prior to 1924, when" Wilkins purchased the three lots. "[T]he resultant annual flooding had been without . . . complaint on the part of the" then owners of the Wilkins lots. The mill site was acquired by one Currier in 1920 by a deed which "refers to the land as containing a saw mill, mill dam and mill privileges." Currier then "repaired the dam, continued the operation of a saw mill, and flooded" the Wilkins land (as had been done for many years prior to 1920) during the period of October 20 to April 20 of each winter season. In 1935 Currier sold the mill site to two of his sons, who removed the mill, retaining the mill wheel. They continued to flood the Wilkins land annually and to pay taxes on the mill privilege until 1950 when they sold the mill site to the town. The flooding by the town's dam is no greater than it was in any of the years that the old dam was in operation. The trial judge ruled that "there is a prescriptive right in Danvers to maintain a dam . . . at its present location and to overflow the plaintiff's testator's land" and that "the prescriptive rights acquired by Danvers' predecessors continue to be held by Danvers."

The following evidence provided a basis for the trial judge's findings and conclusions. There was a mill and dam

---

[1] The town was obliged (by the failure of the trial judge to approve the town's counter designation of certain portions of the transcript and exhibits for printing in the record) to print, under Rule 2 (F), as an appendix to its brief, considerable testimony essential to support important findings. This material should have been included as part of the record on appeal to carry out the purpose of Rule 2 "to achieve an abbreviated record which is to be treated as a report of all the evidence." See *Cohen* v. *Santoianni*, 330 Mass. 187, 190. See also *Zaltman* v. *Daris*, 331 Mass. 458, 461.

on the premises at least as early as 1892. Prior to (as well as after) the sale in 1920 to the elder Currier, logs were hauled or floated through the mill pond from its upper part to the mill. Lumber "came from around the immediate community." When the water was frozen, it permitted the mill owner to "carry the logs across from the island [probably one owned by Currier in the pond] to the mill, over the ice." Wood was also cut on the shore line. There was no other way (even for Wilkins) of "getting the wood off those islands" although tradition is that "years ago" oxen could get through. However, in the time of a witness who remembered back to 1895, "you never could do it, not the way it is now." There are no log roads or wood roads of any sort. At one time the Curriers had an ice boat on the pond, used on all the flooded land. Bushes and brush have grown up on the flooded portions of the Wilkins place, some portions of which are wet in times of heavy rains, apparently even when the dam is open, so that water can be seen on the meadows. There are no retaining walls to keep the water from going to the Wilkins lots, possibly because of their small value, for they were assessed from 1950 to 1955 for only $300. The purpose of the dam was "not entirely" to run the mill. It "was used for all the surrounding land owners there to get their wood and lumber . . . for years." The elder Currier "cut ice on" the pond and this use has continued up to recent years (1936 to 1950) on the part at least of a brother (then and still in the ice business) of those Currier sons who conveyed the land to the town. The Curriers maintained ice houses on the watershed. The use of the dam by the town has continued during the same period each year as prior to the town's ownership, the same portion of the Wilkins land has been flooded, and the height of the water during the town's ownership has been the same as, or even twelve inches lower than, before. Since the town's dam has been in operation, the Wilkins land had been flooded on some occasions not within the period October 20 to April 20, but it is not clear from the evidence that the dam was in operation on such occasions or that this was not

caused by high rainfall. Fishing has been done through the ice. There was never any intention by the Curriers to abandon the mill privilege.

1. On the evidence and the findings, the town's predecessors in title had clearly acquired prior to 1920 a prescriptive right to maintain a dam which would flood the Wilkins lots, without any obligation to pay damages, at least for all purposes of conducting a mill in accordance with the mill act found in G. L. (Ter. Ed.) c. 253, §§ 1, 4, 8–15, 20 (*Williams* v. *Nelson*, 23 Pick. 141, 147. *Craig* v. *Lewis*, 110 Mass. 377, 379. *Isele* v. *Arlington Five Cents Savings Bank*, 135 Mass. 142, 144). Presumably also, the long continued use of the pond for ice cutting has given rise to a prescriptive right to maintain the dam for that purpose without any payment of damages under G. L. (Ter. Ed.) c. 253, § 41. Compare *Barker* v. *Kennard*, 226 Mass. 586, 590–591; *Washburn* v. *Campbell*, 267 Mass. 285, 289.

The early cases indicate that prescriptive rights gained only under the mill act amount not to a general easement to flow but only to a right to cause the flooding without paying damages under the act. See *Williams* v. *Nelson*, 23 Pick. 141, 143; *Wood* v. *Edes*, 2 Allen, 578, 580; *Lowell* v. *Boston*, 111 Mass. 454, 466–467; *Boston Manuf. Co.* v. *Burgin*, 114 Mass. 340, 342. Compare Powell, Real Property, § 408. Later cases refer to such rights as an easement, but do not decide that the easement is general. See *Kenison* v. *Arlington*, 144 Mass. 456, 457–458, and cases cited; *Dickinson* v. *New England Power Co.* 257 Mass. 108, 112,[1] and cases cited.

Cases discussing privileges gained only under the mill

---

[1] See also *Turner* v. *Nye*, 154 Mass. 579, 583; *Nye* v. *Swift*, 190 Mass. 143, 147; *Smith* v. *New England Aircraft Co. Inc.* 270 Mass. 511, 524; and the discussion in Fox, Constitutional Checks upon Municipal Enterprise, 5 Harv. L. Rev. 30, 32–33; see Gould, Waters (3d ed.) §§ 579–603 especially §§ 602–603; Angell, Water Courses (7th ed.) §§ 115–119, 330–386; Washburn, Easements and Servitudes (4th ed.) 445 et seq. As illustration of prescriptive rights which may be established by use under the mill act, see *Brace* v. *Yale*, 10 Allen, 441; *Brace* v. *Yale*, 97 Mass. 18, 20–21; *Brace* v. *Yale*, 99 Mass. 488; *Powers* v. *Osgood*, 102 Mass. 454, 457–458. See, for a general discussion of the early mill act cases, Levy, The Law of the Commonwealth and Chief Justice Shaw, 255–258, 307.

act do not necessarily control the present case, where the owner of a dam presents evidence of use of the impounded waters not only for mill purposes but also for other purposes for over twenty years in a manner which might give rise (if there were no mill use) to the acquisition of general prescriptive rights. The findings and evidence already summarized thus raise the question whether the prescriptive right held by the town and its predecessors in title is "a general right to flow" or whether "the fact that this right was used in connection with a mill" confined it "to use for mill purposes." See *Kenison* v. *Arlington*, 144 Mass. 456, 458.

To establish a general prescriptive easement to maintain the dam, even though it floods the Wilkins lots, there must have been (see Restatement: Property, § 457) use of land which is (a) adverse, and (b) for the period of prescription, continuous, and uninterrupted. *Tucker* v. *Poch*, 321 Mass. 321, 323–324. See Am. Law of Property, §§ 8.52–8.58; Powell, Real Property, §§ 413, 720. Since there is no doubt that the flooding of the Wilkins lots had gone on for more than the twenty year prescriptive period (see G. L. [Ter. Ed.] c. 187, § 2) even before 1920, it must be determined whether the use was (a) made otherwise than in subordination to the owners of the Wilkins lots, (b) wrongful as to them, and (c) open and notorious. See Restatement: Property, § 458.

The owners of the dam appear to have caused the flooding for every purpose convenient or useful to them and without any indication in the record of (a) any subordination to, or license from, the owners of the Wilkins lots or (b) any concern whether the owners of those lots could prevent, or would be injured by, the use. The use was open and notorious. Such activities as were carried on are in their nature conspicuous and certainly must have been well known to the whole of a small semi-rural community. See *Tinker* v. *Bessel*, 213 Mass. 74. Compare *Gower* v. *Saugus*, 315 Mass. 677, 681–683.

In considering whether the use was adverse to the nor-

mal rights (see *Tourtellot* v. *Phelps*, 4 Gray, 370, 376; *Taft* v. *Bridgeton Worsted Co.* 237 Mass. 385, 388–389) of the owners of the Wilkins lots, we start with the "rule in Massachusetts . . . that wherever there has been the use of an easement for twenty years unexplained, it will be presumed to be under claim of right and adverse, and will be sufficient to establish title by prescription and to authorize the presumption of a grant unless controlled or explained." *Truc* v. *Field*, 269 Mass. 524, 528–529. *Tucker* v. *Poch*, 321 Mass. 321, 324. This rule is appropriately to be applied here notwithstanding the circumstance that the owners of the Wilkins land could not have enjoined the continuance of the dam because of the provisions of the mill act. Under the mill act, they had only a claim to damages (see *Duncan* v. *New England Power Co.* 225 Mass. 155, 159) but this claim was not asserted. The owners of the Wilkins lots might have erected a dike to keep the flood waters out. *Williams* v. *Nelson*, 23 Pick. 141, 143. *Boston Manuf. Co.* v. *Burgin*, 114 Mass. 340, 342. See *Wood* v. *Edes*, 2 Allen, 578, 580; *Kenison* v. *Arlington*, 144 Mass. 456, 457. No dike was built. They obviously could not interfere with the acquisition of a prescriptive right by direct action affecting the operation of the mill (see *Turner* v. *Nye*, 154 Mass. 579, 583) so as to interrupt its use in the way that the owner of land, frequently crossed by a neighbor, may block the route so used. Compare *Akasu* v. *Power*, 325 Mass. 497, 502. However, the owners of the Wilkins lots could have prevented the acquisition of any easement by service upon the owners of the dam, and posting, of an appropriate notice under what is now G. L. (Ter. Ed.) c. 187, §§ 3, 4, the provisions of which have been in effect in substantially their present form since Rev. Sts. (1836) c. 60, § 28. See also St. 1867, c. 302. See *Holyoke Water Power Co.* v. *American Writing Paper Co. Inc.* 90 Fed. (2d) 509, 513 (C. C. A. 1).

The trial judge's findings and conclusions, already summarized, are justified by a fair preponderance of the evidence. Although his subsidiary findings on the details of all the uses made of the impounded waters are not as complete

as might be desirable, we, ourselves, on the evidence (drawing such reasonable inferences as may be necessary) conclude (1) that the successive owners of the dam site had continuously and openly exercised for far more than twenty years prior to 1935 the right to maintain the dam (without any expressed limitation of the purpose of their activities) for mill purposes, for the cutting of ice, for harvesting and hauling timber, for access to inaccessible woodlots over the ice, and (to the extent, probably slight, that they wished to do so) for fishing and boating, (2) that the owners of the Wilkins lots never before 1953 took any of the available steps to prevent the acquisition of prescriptive rights by the owners of the dam, and (3) that the use was adverse to the owners of the Wilkins lots. Although no precisely controlling precedent has been brought to our attention, we think that, to the extent that the town's maintenance of its dam, as in the past, may cause flooding of the Wilkins lots,[1] the town has an easement by prescription to do so.

The use of the retained waters and the flooding of the Wilkins lots for purposes in addition to the use for mill purposes bear some resemblance to the situation of an excessive adverse use for more than twenty years of an easement by grant mentioned in a dictum in *Atkins* v. *Bordman,* 20 Pick. 291, 302, where Morton, J., said, "If the way . . . here reserved for foot passengers . . . had been used for forty years and upwards for carriages, it would unquestionably be good evidence of a carriage-way by prescription, notwithstanding the origin of the way." See Washburn, Easements and Servitudes (4th ed.) 161. Powell, Real Property, § 413, note 64. In the case at bar, the dam could have been justified for mill purposes under the mill act, but it seems not to have been questioned either for

---

[1] The owners of the Wilkins lots, of course, may use them in any way consistent with the town's easement. *Taft* v. *Bridgeton Worsted Co.* 237 Mass. 385, 389. See *S. C.* 246 Mass. 444. It is not necessary, however, on this record to determine what uses may be consistent. The *Taft* case (at page 389) indicates that persons in the position of the owners of the Wilkins lots have "no right to compel the defendant to maintain its dam for their benefit."

mill purposes or for any other purposes, and the general use made created a prescriptive right as broad as the use, despite the fact that the use was lawful in part. See *Carson v. Brady,* 329 Mass. 36, 42, where it is said, "The measure of the prescriptive right . . . acquired . . . depends upon the character, nature, and extent of the actual use made . . . during the period necessary to gain the right." See also *New England Mica Co.* v. *Waltham Factories, Inc.* 301 Mass. 56, 58–59; and notes in 110 A. L. R. 915; 170 A. L. R. 776, 779 et seq. Compare *Fortier* v. *H. P. Hood & Sons, Inc.* 307 Mass. 292, 298–300.

2. The record shows no intentional abandonment of the prescriptive rights which the town and its predecessors have acquired under the mill act or otherwise. Those rights have been constantly asserted by the town and its predecessors in title (a) by actual flowing of the Wilkins lots for various purposes, by maintenance of the mill wheel, after the mill was torn down in 1936 until 1950, and by payment of taxes on the mill privilege up to the conveyance to the town, and (b) the conveyance of the mill privileges in the 1950 deed. Extinguishment of those rights has not yet occurred through lapse of time or by affirmative acts by the town or its predecessors, inconsistent with the prescriptive rights attached to the town's property. See *Alvord* v. *Bicknell,* 280 Mass. 567, 571 (indicating that abandonment, at least of an easement by grant, is regarded as "a question of intention"); Restatement: Property, § 504, especially comments d and e; Note 25 A. L. R. (2d) 1265, 1283 et seq; 1308 et seq; Tiffany, Real Property (3d ed.) § 825; Powell, Real Property, § 423. Compare *Cianciulli* v. *Marlowe,* 330 Mass. 410, 413. It might be open to the town (or to a transferee from it of the mill rights) to resume mill operations until the moment when, through lapse of time or otherwise, the rights under the mill act, which are necessarily related to mill use (*Fitch* v. *Stevens,* 4 Met. 426, 428), must be held to be wholly abandoned. See *French* v. *Braintree Manuf. Co.* 23 Pick. 216, 221–224 (twenty years of disuse of mill privilege held strong evidence of ceasing to use privilege for an

unreasonable time); *Butterfield* v. *Reed,* 160 Mass. 361, 369–370 (where, however, the right of flowage rested on grant rather than on prescription). Compare *Fitch* v. *Stevens,* 4 Met. 426, 428; *Hodges* v. *Hodges,* 5 Met. 205, 212; *Gloucester Water Supply Co.* v. *Gloucester,* 179 Mass. 365, 379.

3. Since we hold that the town has a prescriptive right to maintain its dam, regardless of its effect upon the Wilkins lots, the plaintiff is not entitled to an injunction. This would be so, even if he, rather than the devisee of his testator (see *Hooker* v. *Porter,* 271 Mass. 441, 447; *Ryan* v. *McManus,* 323 Mass. 221, 231–232), were the present owner of the Wilkins lots. In view of the town's prescriptive right the plaintiff is also not entitled to have the case retained for assessment of the damages caused by the dam prior to the death of his testator.

*Decree affirmed with costs of the appeal.*